Good morning, honors. My name is Allyson Goddard, and I represent the plaintiffs Frederick Friedman, Scott Nance, and the class. I'd like to reserve three minutes for rebuttal. Honors, the trial court's decision should be reversed if it applies an excessively narrow definition of employee and work that's not consistent with precedent regarding the Fair Labor Standards Act. Essentially, what the trial court ruled was that an employer can force employees to attend on-the-job training on specific policies regarding the employer. It relied on cases that examined a totally different factual situation, which was where employees were provided vocational training. And it created a new test, the immediate advantage test the trial court did, that's not consistent with scientific precedent. The trial court's decision also applied an excessively narrow definition of work. Essentially, what the trial court determined was that a trucking company can force people to sit in a truck in motion for hours on end, in between deliveries and pickups, and not be compensated for that work. The only basis for this was a single regulation that is contradicted by the Department of Labor's own failed handbook and is not consistent with this court's test in Brinley v. Eugene. Looking at the orientation policy, one of the, if you look at the policy, essentially what happened is employees were pre-screened. They were only invited to attend orientation if they already had driving experience or had been to a trucking school. And when they were brought to the orientation, it was a three-day process. There was a skills test and drug testing, and then paperwork was filled out, and then approximately two days were spent walking through a specific policy manual of the defendant. Now, where is it in the record that two days were spent walking through the policy manual? I had trouble figuring out the breakdown of time and what was spent on what in this three-day period. Robert, if you look at the Williams deposition at ER 860-889, Mr. Williams discussed, he handled the classroom portion of orientation. He talked about how he walked through the driver reference manual and walking through the specific policies of a trucking company. I'm going to have to say he spent two days on that, because I thought that was a reference to it being a short amount of time somewhere. I believe that is in there, and I also believe it is also in the parties' briefs. Well, I'll get an exact cite for you from a bottle. To the extent that the time was spent doing drug testing and driving testing, why should we just consider this like a job application of an extended interview? Well, I can see how that looks a little different from the classroom time learning about specific policies. But the question is, do they pay their employees for that type of work anyway? So, for example, if you're an employee and you've been working for a year or so, and you have to take a renewed skills test, you have to take a renewed drug test, they pay their employees when they get drug tested while they're working for the company. They don't consider that to be separate, non-working time. They're just trying to carve this time out, because it happens at the front end. And at the time that they are going through these testings, they've been filling out paperwork that refers to them as drivers, not as applicants. And as soon as they get to the orientation itself, in Mr. Nance's case, he was given a one-way bus ticket. And he had already been through the interview process. He'd been through it. Lots of people are given expenses to apply to a job interview and have to fill out paperwork about a lawyer application. They have to fill out lots of paperwork about prior conflicts or other things. And you may have to take some sort of test. And I don't think it's a normal practice for employers to pay for the time you spend interviewing and filling out paperwork as part of a job application. Well, all of that paperwork was not just the I-9 or the W-4. It was also reviewing the policies that would be applicable to them as drivers. So it was a series of paperwork, including, for example, the I-Line policy. That was one of the documents they were asked to sign. And so, for example, if there had been a change in policy, let's say, to existing drivers, would they have said, You have to come in and sign this paperwork on our new policies, and we're not going to pay you for your time. Were these people hired as a result of going through orientation? Your Honor, there's a dispute on that. It's our contention that they were hired, that essentially they came only All of them. All of them, because they were invited to 95% or something more like that. At the end of the day, some people voluntarily withdrew. They may not have gone. One of your clients, isn't Mr. Friedman, wasn't hired right away? In our opinion, Your Honor, he was hired. He was given payroll com data cards that he could be paid. He couldn't start driving for the company until he made his medical clearance, and that's a DOT regulation. But if he had never made his medical clearance, he would have never started driving, so he wouldn't really have been hired. Well, he still performed work on behalf of the company. What was it that he performed? He sat through and listened and understood their policies and got himself prepared to start driving. But was there any benefit to the company until he actually started driving? Yes, because there was no delay. Let's say that the company hired them without the training, for example. Well, they needed to explain to the drivers before they went on the road what the company's policies were and how many trucking wanted them to drive the truck. So that is important training. And they're trying to say, because it happened before we said you're hired, even though it happened after we called your driver, after you filled in the I-9, after you filled in the W-4, they're trying to use that basically like a trick of time. Did any of the I-9s or anything have a date of starting work that included the orientation that you did? Is there any evidence that any of these people expected they were going campaign for those dates? Your Honor, our clients did acknowledge that they did not have an expectation that they were going to get paid. We disagree that that should carry the day here because they were being taken advantage of by an employer. And so the fact that the employer says we're not going to pay you doesn't mean that that defines the law. The employer shouldn't be able to declare what the law is, which is essentially what happens if you allow the employer to just say, we're not going to pay you, and then we say, okay, fine, that's fine. You're letting the employer essentially define that. Isn't it at least a factor to be considered, though? I would concede, Your Honor, that it definitely is something that the court should take into consideration. I see that I'm eating into my rebuttal time. You're welcome to stay for the rest. Okay. Thank you. May it please the Court, my name is James Hanson, and I represent the defendant, Kathleen, a trucking company. We ask that the court's decision in this case be affirmed. The orientation time is not tied with the employees, as the court noted, to help perform any work for a trucking company. They need to make any delivery of loads. They're drivers. That's what they would have done. The cases that have found people coming in in the process of this to be employees are ones who have performed the work, including the employer. There are cases, in all cases, somebody come in on the basis, as Your Honor mentioned, of an extended interview process. Realize, for a trucking company, drivers come in from many different distances. It's the company's first opportunity to see them face-to-face, and the company is required to ensure that they can safely operate for their own vehicle. And they do that through a number of ways. They give them a drug test. They complete all of the paperwork required by the DOT, which is required to be in a file for anybody that is hired. They are required to do the drug test, the boat test, there's one other test. But there's different things that they've got to do in order to qualify. Do you know how much of the time in these three days that are spent taking tests that would be usually seen as part of an application process, and how much is more of learning the company's policies? Taking the test takes about the first day that they come. They fill out some forms. They take the test. They do the boat test. They do the drug and alcohol. The other test is the DOT physical that the company is required to have for any driver. So all of those are required and are done generally on the first day. The company still has to ensure that the person can safely operate a commercial motor vehicle. We're talking about 18-wheel vehicles up to 80,000 pounds, and they have to be assured when they put somebody behind the wheel that the person can safely operate the truck. So how are the two days of learning about the company's policies going to help them figure out if they can drive their vehicle safely? That is a mischaracterization of what occurs, Connor. When they talk about going over the company policy manual, the policy manual is made up of almost entirely about DOT federal regulations governing drivers. It covers the safe operation of commercial motor vehicles. It deals with sleep habits and making sure that the driver understands what he has to do in terms of maintaining his logs. He has to report his time 24 hours a day as a driver so that the DOT or the police can check to make sure that he is operating in accordance with the rules that have been established for truck drivers. In this case, the company goes through to ensure that they know how to log the time so that they can prove that they are legally operating the vehicle. They also have to know how to secure a load because if loads shift, trucks can turn over. So they have to know all of the rules that the federal motor carrier safety regulations are generally set forth in 49 CFR 393-398-7. And they cover a variety of things, including the hours of service, including the loads. It includes different things regarding the equipment, how to check the equipment. Are those not things they would have learned in the truck driving school that all these people have already done? Yes, and that's one of the factors. If you look at the six factors that have been devised by the DOL, the question is, is it similar to what would be covered in a vocational school? And it is. Plaintiffs both admitted that the information that was covered during these last two days was information that they had also covered during their truck driving school, which means it's similar to what they received in school. So why would they have to go through it on their own neck again? Because we haven't decided whether to hire them. When they come, they sign a form, and they both acknowledge they signed the form, and the form did not say that they were not guaranteed a job. They both acknowledge that they did not have a guaranteed job. I understand that, but you're not answering my question. I'm sorry. Well, at least the essence of my question. If they've already gone through it, you say, well, now would they have to hear it from us? They get tested at the end of this. I mean, what kind of evaluation occurs after these two days, two extra days, if you will, of instruction on the handbook and everything? That helps the company decide to make the hiring decision. The company does not get a separate test. What the company does is give information to the drivers, and then as you do in any classroom setting, you would have an understanding as to whether the people inside the classroom understand the information that you're providing to them. Now, they may ask questions. They have an opportunity to go over that with you. You have an opportunity to talk to them to make sure that they understand, because we're going to put them into a truck. We're not going to be considering that. Is there any evidence that as a part of the classroom interaction, some people are sort of told to leave as opposed to those who may voluntarily leave? The number was that the company hires between 90% and 95% of people who come to orientation. Are those 5% to 10% that don't get hired people who fail the first day of testing? Is there anyone in those 5% to 10% that you can point to who somehow didn't survive the classroom experience? I don't have anybody in particular. We know that Mr. Mann or Mr. Friedman failed. But that was a medical. It was a medical. And rather than us telling him to stay, as Plaintiff's portrayed it, that is incorrect. He wanted to stay so that if he got the medical problem cleared, he could come back and would not have to sit back through orientation again. So it would be an advantage to him. But that doesn't really tell us, I think, the answer to Judge Fisher's question, which is you're saying that this classroom time is for the company to make sure these drivers are safe. But is there anything in the record that shows that they're actually evaluating the students during those two days? Yes. I mean, there was anecdotal information provided by the company witnesses who said not everybody that made it through the end, you know, got through the entire time, was actually put in a truck and left. Right. Did they ever say it's because of what happened in the classroom? It would have been because it would have otherwise passed the DOT physical de-drinking alcohol test. Can you tell us where that is in the record? I do not have that at this time. I would have to search for that. I think it would be helpful if you could point us to that because that might be relevant. Okay. I have another question about the minimum wage payments. So it seemed that in the opening brief there was a reference to the pre-2011 time and whether people ever got the minimum wage at that time, and I didn't see a response in your brief about that. Is that claim still alive, and what is your response to it? That claim is not still alive. They never showed. For example, Mr. Nance was a class representative. Mr. Nance never had a time where he did not receive the minimum wage while he was a driver and employed as a driver for a manufacturing company. They never provided any evidence that there was anyone that did not receive the minimum wage. But you did change your payment policies after April 2011, right, to increase how much people were getting paid? We have made various changes through the years based on the number of hours people are working while they're in training, as well as although the minimum wage hasn't changed for a while, I don't think it changed during this class period, but we also had before again the minimum wage had changed. Okay. Is it correct to not make any specific findings with respect to this issue? It did not, and there was nothing presented by the plaintiffs that there was a minimum wage violation prior to 2011. We could have addressed it if they had proven something, but they didn't prove any violation. So whether there was or not is a matter of conjecture because the plaintiffs haven't demonstrated it. So did you move for a summary judgment on that? What happened to that claim? We moved for the court. Their issue was the time spent on the sleeper, earthquake-removing truck should be compensable work time, should be added to the number of hours because we count this in terms of determining minimum wage deployments. We use the on-duty driving and on-duty non-driving time. What they want to do is include the sleeper. I understand, but I'm not looking at their complaint like they had a sleeper berth claim and then also a driving claim about the people who were riding along during the training weeks and whether even in the driving time they were getting minimum wage. This is a discharacterization by the plaintiffs of what happens with a driver-trainer and a driver-trainee. They are generally logging the same time every day. Once in the driver's seat driving the vehicle, oftentimes the trainee and the driver-trainer are sitting in the passenger seat observing, but the time that the trainer is in the passenger seat is logged as on-duty non-driving time. The driver-trainee would log it as on-duty driving. If they flip so that the trainee can watch the driver operate the equipment, the trainee would be including that on his on-duty non-driving. If he's in the front seat of the truck doing work because he's observing how to operate a commercial motor vehicle, he would be logging that time as on-duty time. That was excluded in this case. I'm sorry, I don't understand. Your time was not excluded in this case? No, that time was included in compensable hours worked because it was logged as on-duty. Before 2011, that was paid like $50 a day or something, and not in a way that reflected a minimum wage per hour calculation. Is that true? Correct. It was paid, for example, if the driver operated five days a week, he got paid $350 because he was available for dispatch over the course of EPM. In effect, a salary of $350 per week, regardless of the number of hours worked. And it was only Mr. Friedman, after we had put the true-up, what I call a true-up, where we added $50 to his pay one week because he had worked more hours than the salary covered. And you started doing it for all the employees after April 2011. Correct. So what happened to the claim in this case about the pre-April 2011 payments? I just never showed that there was anybody prior to 2011 that had a minimum wage claim. So did you move for summary judgment on that claim in the case, saying they have no evidence, but you get summary judgment? We moved the summary judgment based on their minimum wage claim at the speaker birth time. I don't think that they ever demonstrated ever that there was any other minimum wage claim. I think that the court's order granting summary judgment on the minimum wage claim would have included that because they never proved it. He disclosed that all the minimum wage claims was his order. Yes. And they haven't argued that there was a minimum wage claim that requires reversal from the court's order. Let's see. Well, we'll ask about it in a few minutes. Thank you very much. Well, thank you. I appreciate it. And I'd ask that you affirm the court's decision. Thank you. Thank you. We've touched them over, so we'll give you to actually have three minutes of break. Thank you, Your Honor. Just starting with the freshest issue first. There was a true-up process put into place in April of 2011. When defendants moved for summary judgment, we objected to any summary judgment of the issue of payment of that on-duty time prior to April 2011. At that point, a class was certified in this case. We did object, and the court granted summary judgment of the entire claim and didn't carve out pre-April 2011 time. We have appeal back here. They did not oppose it, and they are opposing brief. I am not prepared to respond to the arguments I just heard now. But we certainly — Well, I think his argument is just this claim doesn't exist, but it's your position the claim does exist and was never really specifically ruled upon. That's correct. And, Your Honor, we have the testimony from Mr. Smith during the case. I apologize I don't have his side to the record, but he did testify that they went back in April 2011 and reviewed time and added time to people. And so there was a problem, if I may just correct that, that starting in April 2011, they looked forward and corrected. I don't think there's any evidence about going back before April. They did not reach back. That's correct. So it's my position that there is still a claim out there for that time, even under their definition of what time worked is. I was trying to figure this out because I think you mentioned in your opening brief they don't say anything, and then you don't mention it in your reply brief. Am I correct about the state of briefing here about this issue? That's my recollection as well. So on the issue, before I go to talk generally about — I just asked you, though, do you think we need — say we disagree with you about everything else. On that issue of pre-April 2011, do you need a trial? Do you need further summary judgment? What do you think should happen with that claim? I think at a minimum that claim should be remanded to the trial court for what to happen next. And then the approved claim, we've got a class of people, and we'll get the records from them pre-April 2011. The class goes back to 2005. So that's a significant amount of time for people to be paid. And we'll ask them to perform that reconciliation process for those people as well. Now, I only have 30 seconds, so I just do — I don't want to respond. You asked about where in the record there's support of two days of classroom orientation. If you look at ER 2319, that is at Mr. Williams' deposition testimony where he was the trainer, the orientation person. Tuesdays — the orientation was usually Tuesday, Wednesday, Thursday of the week. Tuesday was typically vote test, and then paperwork. And then Wednesday and Thursday were the classroom orientations. And then if you look at EI 935, you can see that Mr. Niantz signed his I-9 on August 30th, which was the first day of his orientation. And I believe my time is up. Your Honor, does anyone have any other specific questions? Thank you, counsel. Thank you. Any other sides for the arguments? The case is submitted, and we are adjourned for the day.
judges: O'scannlain, Fisher, Friedland